William Bernstein v. Commissioner.
Bernstein v. Commissioner
Docket No. 29332.
United States Tax Court
1952 Tax Ct. Memo LEXIS 330; 11 T.C.M. (CCH) 118; T.C.M. (RIA) 52031; February 8, 1952
*330 Herrick K. Lidstone, Esq., for the petitioner. Arthur L. Nims, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: The respondent has determined a deficiency in income and victory tax for 1943 in the amount of $9,127.05. The year 1942 is involved because of the provisions of the Current Tax Payment Act. The petitioner does not contest some adjustments increasing his taxable income. One question only is raised by the pleadings, whether an alleged indebtedness of a corporation, in the amount of $14,995.56, was a business indebtedness within section 23(k)(1). The petitioner filed his return with the collector for the third district of New York. Findings of Fact The facts which have been stipulated are found as facts. The stipulations are incorporated herein by this reference. The petitioner is a lawyer and a certified public accountant, practicing in New York City. During 1943, he was engaged in the practice of his professions. He received fees in 1943 in the total amount of $49,043.35 for his services. The only other income he received was interest and dividends in the total amount of $366.19. During 1943, the petitioner *331 owned stock in two real estate corporations, ZEX Realty and D.W. & B. Corporation. Also, he owned securities for investment purposes in corporations such as American Telephone and Telegraph Company. The only property owned by Zex Realty was a corner lot on Flatbush Avenue in Brooklyn; and the only property owned by D.W. & B. Corporation was unimproved and unsubdivided acreage in Connecticut. Each of these corporations acquired the property each owned in 1925. The petitioner was an officer of each corporation. He was the manager of Zex Realty. Each corporation was closely held; and each corporation had three stockholders, only, including the petitioner. In about 1923, the petitioner was a stockholder of a corporation which owned a leasehold. He ceased to be interested in that corporation in about 1929. Many of the petitioner's clients, in 1943, were interested in real estate transactions. The petitioner represented his clients in such transactions as their lawyer and accountant, and he performed the usual legal services of drafting contracts and mortgages, as well as serving them in their negotiations. The petitioner, in 1943, was not engaged in a business of managing and financing *332 Zex Realty corporation; he was not engaged in a business of promoting, financing, and operating real estate companies; and he was not engaged in any sort of real estate business. The petitioner, in 1943, was engaged in the business of practicing law and accountancy. At some time before 1932, the petitioner had a deposit account with the Harriman National Bank. The bank was closed in 1932, and the petitioner was unable to collect $57.86, the amount owing to him. In 1943, the petitioner received a final, liquidating dividend of $47. His loss was $10.86. This item does not relate in any way to the Zex corporation. The Zex Realty corporation was organized in 1925. The petitioner owned 100 shares of its stock. Zex was dissolved in 1943, and the petitioner took a capital loss deduction in his income tax return because the stock became worthless in 1943. The respondent has allowed the deduction to the extent of $1,000. The petitioner admits that his allowable capital losses for 1943 are limited by statute to $1,000. In August, 1925, the petitioner and five associates, the Shapiro group, organized a New York corporation, Zex Realty, for the purpose of acquiring a corner lot on Flatbush *333 Avenue at U Street, Brooklyn. The selling price of the lot was $70,000. The lot was acquired in the following way: Zex Realty paid the seller $25,000, and gave him a purchase money mortgage for the balance, $25,000, which was a second mortgage. Zex gave a bank a first mortgage in the amount of $20,000. Zex obtained the purchase money, $25,000 from its six stockholders who purchased 300 shares of its stock for $100 per share. Zex was organized with capital in the amount of $33,500, which represented $30,000 which it received for its stock, and $3,500 which the stockholders contributed for working capital. The lot acquired by Zex was unimproved. The organizers of Zex expected to resell the lot at a profit. The carrying charges of the lot, mortgage interest and taxes, amounted to about $4,350 annually, exclusive of other incidental carrying charges. After Zex purchased the lot, it had $8,500 left out of its capital. Zex did not sell the lot, but held it for several years. In 1927, the Shapiro group - five stockholders - decided to step out of the venture. They sold their stock, 250 shares, to Benjamin Katz and Benjamin Ogush, for $7,500, or $30 per share. Katz and Ogush had been *334 clients of the petitioner, and he interested them in purchasing stock in Zex. As Zex was without capital in 1927, Katz and Ogush contributed $2,500, capital, to Zex at the time they became stockholders. When the Shapiro group sold their stock, all of the outstanding stock was cancelled, and new stock certificates were issued to petitioner, Katz, and Ogush in the amount of 100 shares, each. Katz became the president of Zex; the petitioner was its treasurer and secretary. Katz and Ogush were partners in the business of manufacturing watch cases and jewelry. Their business is now known as the Gruen Watch Company, located in Cincinnati, Ohio. They did not want to be concerned with the actual operations of Zex Realty and bought its stock with the understanding that the petitioner would act as manager and look after all of the operations of the venture. The petitioner managed the affairs of Zex until its dissolution on December 30, 1943. When Katz and Ogush became stockholders of Zex, the property of Zex was still unimproved and Zex had no source of income. It had no capital other than the $2,500 contributed by the two new stockholders. When the first mortgage became due in 1928, Zex *335 was unable to pay the loan secured by the mortgage. The first mortgagee agreed, however, to extend the loan and mortgage for three years, provided the three stockholders executed a collateral bond, personally guaranteeing payment, which they did. Zex continued to hold the unimproved lot and continued to be without any income until 1936, during which year the locality was rezoned as a business area; and Zex leased the property to the Sinclair Oil Company for ten years for a gasoline filling station. Under the lease, Zex agreed to construct the filling station building, and did so at a cost of $10,220, of which $7,000 was loaned by the first mortgagee, increasing the first mortgage to $27,000. The filling station was completed in 1937. The lease rent was $3,500 annually during the first five years, and $4,000 annually during the last five years. From 1937 through 1939, expenses of Zex exceeded its income to the extent of about $170 each year. The income exceeded expenses in 1940, 1941, and 1942, and the aggregate income during those three years was $2,115.06, which was paid to the first mortgagee. When the second mortgage became due, which was at some time after 1928, the petitioner, *336 Katz, and Ogush purchased the mortgage from the mortgagee. In December of 1943, Zex conveyed the title to the Flatbush property to the holders of the second mortgage in exchange for cancellation of the second mortgage. This conveyance left Zex without any assets other than cash in bank and receivable accounts totalling $327.23. The stockholders decided to dissolve Zex and did so on December 30, 1943. At the time of dissolution, Zex had accrued expenses owing in the amount of $270.77, after which it had $56.46 left. Also, there were loan accounts on its books which showed amounts owing to the petitioner, Katz, and the Estate of Ogush, who died in 1941, the balance of which accounts, after some adjustments to equalize the accounts, was $14,984.70, in each account. During the period of fifteen years, from January 1, 1928, until December 30, 1943, each of the stockholders advanced cash periodically to Zex in equal amounts; and by January 1, 1940, each had advanced $14,612.93, or $43,838.79, in addition to the $2,500 contributed in 1927. After the death of Ogush, the petitioner and Katz continued to make advances, and after some equalizing adjustments, the total advanced by each stockholder *337 was $14,984.70, as of December 30, 1943. Zex needed the sums advanced periodically to pay mortgage interest, taxes, street assessments, part of the cost of constructing the filling station, and principal installments in reduction of the first mortgage, which was reduced to $18,500. The petitioner advanced to Zex, the total amount of $14,984.70. He made advances periodically during each of the years 1928-1943, with the exception of 1942 when nothing was paid to Zex. The total sums advanced by the petitioner varied each year from as much as $1,935 to as little as $71.77. It was understood that each stockholder's advances would be equal in amount, but the petitioner sometimes advanced cash to Zex before the others sent their contributions, and in anticipation of them. In those instances, the petitioner recouped from Zex the excess over his share of each advance when the contributions of his associates were received. In this way, the advances of each stockholder were kept equal in amount. Petitioner's shares, each year, of advances, which he made, are set forth in the margin. [1] Zex did not give the petitioner, or the other stockholders, any notes for the advances; there was no agreement *338 that any of the advances would be repaid by Zex at any fixed date; and no corporate action was taken to authorize Zex's borrowing funds from, and agreeing to make repayment to, the petitioner, or the other two stockholders. No interest on the advances was paid or agreed upon. The stockholders did not ask for notes. Katz did not expect to receive repayment of his advances until property was sold or otherwise disposed of. Zex did not repay any of the advances; it had no income at all, or, when it earned income under the Sinclair lease, such small income as it realized was paid to the first mortgagee. However, in the accounting records of Zex, loan accounts were kept in the name of each stockholder in which the receipts of the advances were entered. In managing the affairs of Zex Realty, the petitioner negotiated the extension of the first mortgage and the Sinclair lease; he expended time in attempting to have the assessed *339 valuation of the property for local taxes reduced; he spent time in attempting to have the area where Zex's property was located rezoned for business uses; he made efforts to sell the property; he communicated with the other two stockholders and obtained funds from them; he looked after the making of various payments by Zex; and, in general, he managed all of the affairs of Zex. In 1947, the owners, the petitioner, Katz, and the Estate of Ogush, sold the Flatbush Avenue property. In advancing money periodically to Zex Realty corporation, the petitioner made contributions to its capital; he did not make loans. Zex did not repay any part of petitioner's advances. Opinion The petitioner deducted $14,995.56 in his return, and in his petition, alleged that Zex corporation owed him that amount. He claims deduction of the entire amount as business bad debt under section 23(k)(1). At the trial, the petitioner, for the first time, asserted that the above amount represents two bad debt losses, one on account of loss of a bank deposit balance in the amount of $10.86, and the other on account of the accumulated advances to Zex corporation. No amended petition was filed, raising an issue *340 about a bank deposit loss. We cannot consider the item of $10.86 because it is not covered by the petitioner's pleadings. It is a rule of this Court that it will not consider issues which are not presented by the pleadings: ; ; . But even if we could, there is no evidence that the bank deposit loss gave rise to a business bad debt loss; we do not know whether the bank account was a personal or a business account. If the loss was not from a business bad debt and was from a non-business bad debt, the petitioner cannot be allowed deduction because he has used up the statutory allowance for capital loss deductions in 1943. The claim for this loss is denied. The petitioner claims deduction for the full amount of his unrecovered advances to Zex Realty corporation. In order to obtain the deduction he must establish that he made loans rather than capital contributions to Zex. In order to get deduction of the full amount involved, if it were held that Zex borrowed funds, the petitioner must prove that the loans gave rise to a business debt within *341 section 23(k)(1), and did not give rise to non-business debt within section 23(k)(4). And, finally, if it were held that the Zex advances were non-business debts, the petitioner is not entitled to any more capital loss deductions in 1943, for the reason stated above. Therefore, the issue to be decided is whether advances to Zex gave rise to business debts, and determination of that issue turns upon decision of the question whether the petitioner's activities in financing and managing Zex constituted the conduct by him of a business. It is concluded that the petitioner's promotion, management, and general activities in operating the Zex Realty corporation did not constitute the conduct of a business. The question is squarely within the rule of , and cases in which the rule of the Clark case has been applied; ; ; ; ; ; and . *342 The petitioner practiced the professions of law and accountancy during 1943, which practice constituted his business. As far as the record before us shows, that practice absorbed substantially all of his time during 1943. He received fees from clients, during 1943, for his professional services, in the total amount of $49,043.35, which was substantially all of his income. Upon the evidence, it cannot be held that his activities relating to the Zex Realty corporation constituted the carrying on of a business. The business of the corporation was not his business. The evidence does not bring this proceeding within the exceptions to the rule of the Clark case. Cf. ; ; and . The petitioner does not contend that he was in the business of financing various enterprises and corporations so as to come within the rule of the foregoing cases. It follows that the alleged loans to Zex gave rise to non-business debts, rather than business debts, if loans were made to Zex, and that the loss comes within section 23(k)(4), rather than section 23(k)(1). The petitioner's claim for *343 deduction of $14,984.70 must be disallowed. We need not consider this issue further, but even if we could approve the petitioner's contention that he was engaged in a business during 1943, which embraced his activities in the Zex corporation, petitioner is required to show that his advances to Zex were loans and were not contributions to capital, as the respondent contends. It is our conclusion, upon carefully analyzing all of the evidence and the circumstances surrounding the advances to Zex, that the money which he and the other stockholders advanced constituted contributions to capital and were not loans. It is true that the petitioner and Katz have testified that it was their intent when they advanced money to Zex to make loans to the corporation, but the preponderance of the evidence does not support the contention that the advances were loans. The advances to Zex were made in the same ratio as the stockholdings. There were none of the usual indicia of a debtor-creditor relationship. The corporation had no operating capital in an amount sufficient, over a period of eighteen years, to defray the carrying charges of the real estate. The stock of the corporation was issued for *344 a nominal amount in view of the required capital. The stockholders were anticipating recovery of their advances out of the proceeds they hoped to realize upon the disposition of the property, and all that they advanced to Zex was put out at the risk of the outcome of the final sale of the property. "The formal characterization as loans on the part of the controlling stockholders may be a relevant factor, but it should not be permitted to obscure the true substance of the transaction." , affd., (C.A. 2, 1951). The following authorities compel rejection of the petitioner's theory that his advances to Zex were loans: , affd., ; ; ; , affd., ; ; . Decision will be entered for the respondent. Footnotes
1. ↩
1928
$ 1,900
1933
$ 625
1938
$ 650
1941
$ 100
1929
1,500
1934
1,162.93
1939
765
1942
0
1930
850
1935
775
1940
200
1943
71.77
1931
1,250
1936
1,935
1932
1,400
1937
1,800
Total
$14,984.70